NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

17-P-10                                             Appeals Court

COMMONWEALTH  vs.  STANLEY JEANNIS.

No. 17-P-10.

Suffolk.     January 11, 2018. - August 31, 2018.

Present:  Rubin, Sacks, & Wendlandt, JJ.

Controlled Substances.  Practice, Criminal, Motion to suppress.
    Search and Seizure, Probable cause, Bodily intrusion, Body
    examination.  Constitutional Law, Search and seizure,
    Probable cause.  Probable Cause.

Indictments found and returned in the Superior Court
Department on June 11, 2015.

A pretrial motion to suppress evidence was heard by Robert
N. Tochka, J., and the cases were tried before Raffi N.
Yessayan, J.

Jane Larmon White for the defendant.
Ian MacLean, Assistant District Attorney, for the
Commonwealth.

RUBIN, J.  The defendant was convicted of possession of a

class A substance (heroin) and possession of a class B substance

(cocaine), and he now appeals.  The issue he raises involves

application of the rule announced in Rodriques v. Furtado, 410

Mass. 878, 888 (1991) (Furtado), allowing the manual search of a body cavity only with a warrant "issued by the authority of a judge, on a strong showing of particularized need supported by a high degree of probable cause," to a circumstance where police seek to remove an item partially protruding from an arrestee's rectum.

Background.  After a hearing on the defendant's motion to suppress, the motion judge found the following facts.  At the police station after his arrest, the defendant complained that he did not feel well because he had swallowed "fifties." Lieutenant David Callahan of the Revere police department, to whom he complained, understood "fifties" to refer to fifty dollar bags of heroin or cocaine.  Callahan did not believe him because the defendant was not exhibiting signs of a drug overdose, and Callahan thought that the defendant was feigning illness.  Nevertheless, Callahan followed protocol and summoned medical assistance.

The defendant sat on a bench during the booking process. Callahan saw that he sat oddly, leaning to one side.  The defendant told Callahan that he might throw up, so Callahan brought him into a nearby cell that had a sink and toilet.

Callahan noticed that the defendant had an unusual gait as he walked to the cell, and that he was not walking "normally." The defendant moved slowly, was rigid and tense, and was

"clenching his buttocks area." Callahan believed that he might have something secreted in that area, which could be a potential safety risk.

Callahan asked Officer Joseph Singer to accompany the defendant and Callahan to the eight foot by eight foot cell. Callahan ordered the defendant to remove his clothing. Reluctantly, the defendant removed his shirt, pants, and socks. He became argumentative when asked to remove his underpants.

Callahan noticed that the defendant, while wearing only underwear, continued to clench his buttocks and attempted to shield his backside from Callahan's and Singer's view. Singer concluded that the defendant was taking a fighting stance. Callahan became concerned that the defendant might be hiding a weapon. Callahan had Singer handcuff one arm of the defendant while holding the defendant's other arm.

The defendant pulled down his waistband and said words to the effect of, "[S]ee I don't have anything." Officer Singer, however, saw a plastic bag protruding from the defendant's buttocks. Singer ordered the defendant to remove the bag or have Singer remove it. The defendant agreed to remove it himself and then pulled down his underwear. Singer put his hand on top of the defendant's hand as the defendant "removed the bag." The bag contained fifteen individually wrapped bags of cocaine and thirteen individually wrapped bags of heroin.

Analysis.  Our cases have distinguished among three related types of searches relevant to this appeal:  strip searches, visual body cavity searches, and manual body cavity searches. "A strip search generally refers to an inspection of a naked individual, without any scrutiny of his body cavities.  A visual body cavity search extends to a visual inspection of the anal and genital areas."  Commonwealth v. Thomas, 429 Mass. 403, 407 n.4 (1999).  A manual body cavity search "involves some degree of touching and probing of body cavities."  Id. at 408.  We have said that "[i]t is difficult to imagine a more intrusive, humiliating, and demeaning search than" a manual body cavity search.  Furtado, 410 Mass. at 888.  Indeed, "strip or visual body cavity searches, by their very nature, are humiliating, demeaning, and terrifying experiences that, without question, constitute a substantial intrusion on one's personal privacy rights protected under the Fourth Amendment [to the United States Constitution] and art. 14 [of the Massachusetts Declaration of Rights]," Commonwealth v. Vick, 90 Mass. App. Ct. 622, 628 (2016), quoting from Commonwealth v. Morales, 462 Mass. 334, 339-340 (2012), and "[m]anual body cavity searches constitute an even greater intrusion on a person's privacy rights," ibid.  Consequently, the Supreme Judicial Court has held that in Massachusetts, even when the police undertake a search incident to a lawful arrest -- in which circumstance case

law holds that a strip search may be conducted without a warrant only when the police have "probable cause to believe that the defendant had concealed [drugs] on his person or his clothing that would not otherwise be discovered by the usual search incident to arrest," Commonwealth v. Prophete, 443 Mass. 548, 554 (2005)[1] -- "a judicially authorized warrant based on 'a strong showing of particularized need supported by a high degree of probable cause' is required for a manual body cavity search." Vick, 90 Mass. App. Ct. at 629, quoting from Furtado, 410 Mass. at 888.  Accord Furtado, 410 Mass. at 888 (warrant to search plaintiff's vagina, issued by assistant clerk-magistrate and presumptively based upon probable cause, not adequate).

The defendant argues that this was not merely a search, but a seizure, of the plastic bag from a body cavity, his rectum, and, applying the principles concerning manual body cavity searches articulated in Furtado, that seizures from a body cavity may be made only on the authority of a warrant issued by a judge and supported by a high degree of probable cause.  We agree.

The Commonwealth's primary argument in response to the defendant's contention is factual.  It argues that all that occurred here was a permissible strip search, because, as a

---

[1] Of course, even with probable cause, strip searches, like all searches, must be undertaken in a reasonable manner. Morales, 462 Mass. at 342.

matter of fact, the plastic bag was seized not from the defendant's rectum, but from what it refers to as his "intergluteal cleft." Our cases indicate that items hidden between the buttocks are not within a "body cavity," and that if a strip search reveals items there that easily fall out, it has not necessarily crossed the line to a manual body cavity search. See Vick, 90 Mass. App. Ct. at 629, 633 (observation of protruding bag of drugs that "was in the 'cleft' of the defendant's buttocks, and not lodged in his rectum," but which fell out with "mere[] 'flick[ing]' or 'brush[ing],'" involved nothing more intrusive than strip search).

The motion judge, however, did not find that the plastic bag was merely held between the defendant's buttocks, nor could he have on the evidence before him. The Commonwealth sought to defend this as a strip search, and in order to make its case, it had the burden to provide evidence from which the judge could find that no portion of the bag was within the defendant's rectum. See Commonwealth v. Taylor, 10 Mass. App. Ct. 452, 454 (1980) ("The burden of justifying the intrusion of a search is on the Commonwealth"). The Commonwealth's witnesses, however, provided no testimony indicating that the bag was simply lodged between the defendant's buttocks, entirely outside his rectum. Contrast Vick, 90 Mass. App. Ct. at 629 n.12 (officer agreed that no "portion of th[e] item [was] within [the defendant's]

rectum or within any sort of orifice of his body" and that he "[did not] have to use force to get the bag out of any sort of body cavity"). Nor is there any testimony, as there was in Vick, indicating that the plastic bag was outside the defendant's rectum such that it easily fell or popped out when the defendant and the officer touched it. Rather, Officer Singer testified only that the defendant "spread one cheek and we reached in and retrieved [the bag] from inside his butt," rather than from between his buttocks, and that "he helped me with the cuffs on to take the drugs out of his butt." The Commonwealth thus did not present sufficient evidence to support a finding of the fact it asserts: that the protruding plastic bag was not partially within the defendant's rectum.[2] That the

---

[2] The parties disagree whether we may consider a certain medical record of the defendant from Cataldo Ambulance Service, Inc., which transported the defendant to the hospital following the search. It states: "PER REVERE [POLICE DEPARTMENT] [PATIENT] HAS BEEN ARRESTED, HAD BEEN FOUND TO HAVE BAGS OF TIGHTLY WRAPPED CRACK COCAINE AND HEROIN (SEPARATELY) HIDDEN IN HIS RECTUM." (There is perhaps a second relevant record, because in closing argument on the motion to suppress defense counsel purported to quote a record, stating, "[I]t says, 'the police state that they took multiple packs of cocaine from his rectum.'" We have before us, however, no such record.)

The judge made no reference to medical records in his memorandum of decision. At the close of the hearing, defense counsel said, "[T]here [are] medical records . . . . [T]hey are not physically in this room. I asked for them to be brought down, but I am fine with arguing while we are waiting." There was no objection. The judge said, "[G]o ahead," and defense counsel began closing argument, purporting to quote from the medical records as described above. The records were not

judge did not find that the plastic bag was merely held between the defendant's buttocks is confirmed by his conclusion, in the "analysis" section of his memorandum of decision, that the reason this was not a cavity search is that the defendant himself removed the bag (a point we discuss later). The judge wrote: "The strip search did not cross over to a cavity search. Singer ordered [the defendant] to remove the bag that he could see protruding from his buttocks or in the alternative have Singer remove it. [The defendant] agreed to, and did, remove it himself." This analysis of why there was no "cross over" would have been unnecessary had the judge concluded that the bag was merely lodged between the defendant's buttocks.[3]

referred to again and the transcript does not indicate that they were admitted. We do have a "list of exhibits" from the hearing on the motion to suppress, and it lists "medical records" as exhibit 15.

The Commonwealth does not argue that the records were not before the judge. It says only that they are ambiguous, that they are hearsay, and that the "judge did not accept the record as fact." The defendant argues that the medical records are not ambiguous, that the police department statement within the medical records is within the hearsay exception for statements made for purposes of medical diagnosis and treatment, and that we are in as good a position as the motion judge to assess the document.

Because we need not and do not rely on the medical records in reaching our conclusion about the judge's findings, we also need not and do not resolve the questions about the statement's admissibility, its meaning, or its weight.

[3] The Commonwealth argues that the motion judge's conclusion that "[t]he strip search did not cross over to a cavity search"

The Commonwealth argues next that this could not have been a manual body cavity search because the police did not "manipulate[e] the defendant's body" or "touch[] or prob[e] . . . [the defendant's] body cavities." Vick, 90 Mass. App. Ct. at 625. But this misses the defendant's point that, regardless of the scope of any search, there was a seizure from his body cavity. The Commonwealth does not address this at all.[4]

The Commonwealth also argues that, as the motion judge concluded, there cannot have been a body cavity search because the defendant removed the bag himself. Even assuming the removal of the bag by the defendant and the police officer together could be characterized as removal by the defendant himself, and applying the Commonwealth's search argument to what the defendant actually contends is a seizure, the question before us is not the manner of the seizure, but the propriety of the seizure itself. The officer ordered the defendant to remove the bag, threatening that otherwise he would do so himself. The Commonwealth provides no reason why it makes any difference whose hand removed the bag, nor any citation to relevant

_____

means that the bag was not in the defendant's rectum. However, as the context of the language quoted in the text reveals, contrary to the Commonwealth's argument, it is not a finding of fact that the bag was simply between the defendant's buttocks, but a conclusion of law that, because the defendant removed the bag himself, Officer Singer performed no cavity search.

[4] Although the motion judge also did not address it, the defendant raised this argument below.

authority.  When a defendant gives something to a police officer after being ordered to do so, the police are nonetheless responsible for the seizure.  See, e.g., Commonwealth v. Torres, 424 Mass. 153, 156 (1997) (trooper seized defendant's wallet when trooper "had [the defendant] turn around and motioned for [the defendant's] wallet by pointing to his rear pants pocket and opening and closing his hand," and defendant "produced his wallet for the trooper").

Turning finally, then, to the propriety of the police action here, we agree with the defendant's characterization of it as a seizure from within a body cavity, in this case, the defendant's rectum.  The removal of an item from within a body cavity from which it is protruding is no less serious an invasion of one's body than a search of that cavity for evidence in the first place.  The Commonwealth does not argue otherwise. The principles articulated in Furtado to address manual body cavity searches are equally applicable in the circumstance of a seizure from within a body cavity.  And indeed, many other jurisdictions have concluded that an item partially protruding from an arrestee's rectum cannot be seized without a warrant in the absence of exigent circumstances, applying the same test to such seizures as they do to manual body cavity searches.  See, e.g., United States v. Fowlkes, 804 F.3d 954, 961-962 (9th Cir. 2015); State v. Barnes, 215 Ariz. 279, 281-282 (Ct. App. 2007);

People v. Hall, 10 N.Y.3d 303, 311 (2008); Hughes v. Commonwealth, 31 Va. App. 447, 459 (2000).  See also Schmerber v. California, 384 U.S. 757, 772 (1966) (police "intrusions into an individual's body" in search of evidence presumptively require warrant in absence of exigent circumstances).  In this Commonwealth, manual body cavity searches require a judicially authorized warrant based on a particularized need supported by heightened probable cause, and we conclude that the same requirements apply with respect to a seizure of an item from within a body cavity.

The Commonwealth argues lastly that if a judicial warrant were required, there were exigent circumstances excusing its failure to obtain one, specifically a safety risk to the officers and the defendant from any hidden weapon.  However, even assuming the officers could still have had an objectively reasonable belief that the completely naked defendant was hiding a weapon -- after seeing only a plastic bag that did not fall out easily when touched, protruding from between his partially spread buttocks -- the defendant was handcuffed in a jail cell and, were that not adequate, could have been restrained in a reasonable manner to ensure safety pending the application to a judge for a warrant.

The defendant also argues that the seizure could be undertaken only by trained medical personnel, at one point

urging that only a medical doctor may properly execute a warrant for a seizure from a body cavity. Searches and seizures involving body cavities, like all searches and seizures by government officials, must be performed in a reasonable manner. Given that risk of medical harm is one of the reasons behind the heightened requirements prefatory to a search of or seizure from a body cavity, "the potential harm to a detainee's health and dignity should be taken into account in assessing the reasonableness of the intrusion." Morales, 462 Mass. at 343. Cf. Schmerber, 384 U.S. at 771-772 (in case concerning blood draw, reserving "the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment"). Given our conclusion that the bag should not have been removed without a judicial warrant, however, we need not resolve in this case the question of what method would be reasonable for lawfully extracting something from an individual's body cavity.

While there was heightened probable cause to believe that the bag protruding from the defendant's rectum contained contraband, it was seized without a judicial warrant in circumstances that do not justify failure to obtain one. Consequently, the motion to suppress should have been allowed. The judgments are reversed, the verdicts are set aside, and the

case is remanded for further proceedings consistent with this opinion.

<u>So ordered</u>.
